UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | 2:13-cv-00993-RCJ-VCF |
| vs. | ) ) | **ORDER** |
| BANC DE BINARY LTD., | ) ) | |
| Defendant. | ) ) | |

This case arises out of the alleged trading of unregistered securities. Pending before the Court is a Motion for Preliminary Injunction (ECF No. 6). Because Defendant has failed to timely respond despite a stipulated extension of time, and for the reasons given herein, the Court grants the motion.

## I.     FACTS AND PROCEDURAL HISTORY

Defendant Banc de Binary, Ltd. is a Cypriot company with a license to operate in Cyprus under supervision of the Cyprus Securities and Exchange Commission, as well as licenses to operate in Germany, Spain, and the United Kingdom, but it has no license from Plaintiff Securities and Exchange Commission ("SEC") to operate in the United States. (*See* Compl. ¶¶ 7–8, June 5, 2013, ECF No. 1). Defendant operates an "online trading platform," selling "binary options." (*Id.* 9). A customer can go to Defendant's website and purchase a binary option, for example in stock of XYZ, Inc. (*Id.*). The customer selects the amount of the binary option (between $1 and $3000) and bets whether the stock of XYZ, Inc. will rise or fall from the

current price as of a given time and date in the future. (*Id.* ¶ 14). Defendant's website then determines the percentage payout the customer will receive if correct. (*Id.* ¶ 15). If the customer is correct, he receives back the initial amount he paid for the binary option plus his winnings (the initial bet multiplied by the percentage payout); if the customer is incorrect, he loses much or all of the price he paid for the binary option. (*Id.* ¶¶ 9, 16). The wagers are called "binary" options because there are only two possible outcomes.

Defendant has never registered with the SEC. (*Id.* ¶ 8). Defendant solicits customers within the United States. (*See id.* ¶¶ 19–23). Although Defendant claims to have stopped soliciting U.S. customers, existing U.S. customers can still use their accounts to purchase binary options. (*Id.* ¶ 24). The SEC has sued Defendant in this Court for violations of § 5 of the Securities Act of 1933 and § 15(a) of the Securities Exchange Act of 1934 and has asked the Court to issue a preliminary injunction.

## II.  LEGAL STANDARDS

The Court of Appeals has used two separate sets of criteria for determining whether to grant preliminary injunctive relief:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.*

The Supreme Court has ruled, however, that a plaintiff seeking an injunction must demonstrate that irreparable harm is "likely," not just possible. *Winter v. NRDC*, 555 U.S. 7, 19–23 (2008) (rejecting the Ninth Circuit's alternative "sliding scale" test, at least as to the

irreparable harm element).  The Court of Appeals has explicitly recognized that its "possibility" test was "definitively refuted" in *Winter*, and that "[t]he proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 129 S. Ct. at 374) (reversing a district court's use of the Ninth Circuit's pre-Winter "sliding-scale" standard and remanding for application of the proper standard).

      A later panel ruled that the sliding scale test remains viable when there is a lesser showing of likelihood of success on the merits amounting to "serious questions," just not when there is a lesser showing of likelihood of irreparable harm. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).  *Cottrell* presents some difficulty in light of *Winter* and *Selecky*.  As an initial matter, to the extent *Cottrell*'s interpretation of *Winter* is inconsistent with *Selecky*'s interpretation of the same case, *Selecky* controls. *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (holding that, in the absence of an intervening Supreme Court decision, only the en banc court may overrule a decision by a three-judge panel).  In any case, the Supreme Court stated in *Winter* that "[a] plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on the merits, that he is *likely* to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)) (emphases added).  The test is presented as a four-part conjunctive test, not as a four-factor balancing test, and the word "likely" modifies the success-on-the-merits prong in exactly the same way it separately modifies the irreparable-harm prong, indicating that in an appropriate case, the Court would require a movant to show that he is more likely than not

to succeed on the merits. In rejecting the sliding-scale test, the *Winter* Court emphasized the fact that the word "*likely*" modifies the irreparable-injury prong. *See id.* at 22 (emphasis in original). The word "likely" also modifies the success-on-the-merits prong. *See id.* at 20.

In summary, to satisfy *Winter*, a movant must show that he is "likely" to succeed on the merits. "Likely" means "having a high probability of occurring or being true." Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/likely. This colloquial, lay definition of "likely" may be too stringent. Though it could be read consistently with *Winter*, Merriam–Webster's definition of "likely" would appear to require a showing corresponding to the clear-and-convincing-evidence standard, because something with a "high probability" of being true has more than a mere greater-than-not chance of being true. Black's Law Dictionary, a more contextual reference work, defines the "likelihood-of-success-on-the-merits test" more leniently as "[t]he rule that a litigant who seeks [preliminary relief] must show a reasonable probability of success . . . ." *Black's Law Dictionary* 1012 (9th ed. 2009). The Court must reconcile the cases by interpreting the *Cottrell* "serious questions" requirement to be in harmony with the *Winter*/*Selecky* "likelihood" standard, not as being in competition with it. "Serious questions going to the merits" must mean that there is at least a reasonable probability of success on the merits. On its face, the phrase "serious questions" appears to focus on the gravity of the issues, but appears silent on the probability of the truth of the proffered proposition, which is the focus of the success-on-the-merits prong. The gravity of the issues is separately considered under the balance-of-hardships prong. The *Cottrell* court must have meant something like "reasonable probability," which appears to be the most lenient position on the sliding scale that can satisfy the requirement that success on the merits be "likely." If success on the merits is merely possible, but not at least reasonably probable, no set of circumstances with respect to the other prongs will justify preliminary relief.

///

## III. ANALYSIS

The Court grants the Motion for Preliminary Injunction. The Court will, however, discuss whether and why binary options, as described in the Complaint, are "securities" the SEC may regulate, because they are not the kind of transaction that one typically thinks of when one thinks of securities.[1] "Security" is defined under the relevant statute as:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10).

Traditional stock options are securities because they are in fact "options," i.e. option contracts, to purchase (or sell) stock itself at a predetermined value. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750–51 (1975). For example, assume XYZ stock currently sells at $5 per share, and that an option to buy one share of XYZ stock for $6 on or before January 1, 2014 currently sells at $0.10 (a typical price). An investor might buy the stock directly and hope its price rises or that it pays dividends. Alternatively, an investor could buy the options. An investor in this situation with $1000 to spend could purchase: (1) 200 shares of XYZ stock at $5 per share; or (2) options to buy 10000 shares of XYZ stock at $6 per share on or before January

---

[1] It may be the case that binary options are in fact simply gambling bets. *See generally* Gordon Pape, *Don't Gamble on Binary Options*, Forbes (July 27, 2010), http://www.forbes.com/sites/investor/2010/07/27/dont-gamble-on-binary-options. The Court finds that they are in fact almost certainly gambling bets, but also that the SEC may regulate them.

1, 2014.  If XYZ stock does not reach $6 per share by January 1, 2014, the investor's options will be worthless, because it makes no sense to purchase stock at above market price.  But if the stock has become worth more than $6 before the options expire, the options could be very profitable, because the investor has the right to purchase 10000 shares of XYZ stock at below market price.  Assume that XYZ stock has risen to $10 per share before the options have expired.  If the investor bought 200 shares of XYZ stock directly, he could sell it for a profit of $1000 (200 shares bought at $5 and sold at $10), but if the investor bought options to buy 10000 shares of XYZ stock at $6 per share, his profit will be $39,000 (10000 shares bought at $6 and sold at $10, minus the $1000 price of the options to buy the shares).  In summary, stock options are a way to multiply the power of investment funds, but they are riskier because they are not sales of stock but sales of options to purchase stock; they expire and are worth nothing if the price doesn't increase or decrease as the investor believes it will.  It is very similar to gambling, but because stock options are in fact option contracts to trade securities, they are clearly "securities" under the Securities Act.

     With a binary option, the purchaser receives no interest in the stock itself (unlike a purchase of stock) and no right to purchase stock in the future (unlike stock options).  Binary options are in substance pure gambling bets.  They are also unlike options in that they do not require exercise by the owner.  They are simply wagers that will pay (or not) automatically upon a certain date.  The condition upon which the bets turn are the price of stock—more accurately, whether a stock has increased or decreased in value as of the time and date of the wager, not by what amount it has increased or decreased in value—and the binary option purchaser receives no putative interest in the stock whatsoever, i.e., no option to purchase or sell it at a given price.  Regardless of their name, then, binary options are in substance not option contracts at all, but wagering contracts.  *Compare Black's Law Dictionary* 375 (9th ed. 2009) ("*wagering conract*. 1. A contract the performance of which depends on the happening of an uncertain event, made

entirely for sport."); *with id.* 1203 ("*option* . . . 4. The right (but not the obligation) to buy or sell a given quantity of securities, commodities, or other assets at a fixed price within a specified time . . . ."). The concept of binary options is relatively new—Black's Law Dictionary has no entry for them. Black's does, however, have an entry for the closest thing to binary options heretofore encountered apart from the entry for "wagering contract." *See id.* 1204 (*naked option*. A call option that grants another the right to buy stock even though the option-giver does not own the stock to back up that commitment."). A naked option is different from a binary option in a critical regard, however, because a naked option is still an option to purchase stock. The fact that the option-giver does not in fact own the stock to back up the option if exercised is relevant to breach of the option contract and perhaps even fraud, but the transaction is still a transaction of securities, because the option-giver has in fact promised to deliver the securities if the option is executed. The naked option purchaser may have no practical ability to obtain stock through the exercise of the option because the option giver has defrauded him (or at least seriously risked an inability to perform under the option contract), but the binary option giver has made no promise of the binary option purchaser's ability to obtain the stock. He has made no pretense of being anything other than a bookmaker. Both parties to a binary option are well aware that the transaction includes no present, future, or contingent interest in the stock itself. Binary option givers and buyers do not purport to trade interests in securities any more than gamblers and tellers at a racetrack purport to trade interests in horses. In these transactions, the securities and the horses, respectively, are not part of the consideration, but are merely the subject of conditions precedent to performance. Although stock investments, and particularly stock options, may also be fairly described as gambling in a colloquial sense, binary options constitute gambling in a more profound and essential way, because the purchaser of a binary option receives no present or future interest whatsoever in any stock or commodity.

Next, binary options resemble European-style options in one way. That is, European-

1  style options, unlike American-style options, may only be executed at the time of expiration.  But
2  unlike binary options, European-style options still include the right to obtain the security via
3  execution at that time.

4  Finally, the binary options at issue here may be "cash-settled options" that the SEC may
5  regulate. *See Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 326–27 (2d Cir. 2002).  The
6  *Caiola* court ruled that the fact that options are cash-settled rather than settled by delivery is not
7  important to whether they qualify as "securities" under the statute. *See id.*  Cash-settled options
8  are those settled with cash, rather than by delivery, either because the option buyer does not care
9  to keep the security, does indeed wish to exercise the right to purchase the security but does not
10 wish to experience the hassle of obtaining physical possession of it due to transport costs or other
11 considerations, or because the security cannot be physically delivered because it involves an
12 interest in something that cannot be delivered in physical form.  Rather, the investor "settles" the
13 option by having the option giver transfer cash to him in an amount equal to the market value of
14 the securities at the time of settlement minus the price at which he has the right to purchase the
15 securities under the option contract.  The investor simply takes his expected profit in cash.  In
16 some cases, it is known ahead of time that cash settlement will be used, and not physical
17 delivery.

18 The Court respectfully disagrees with the Second Circuit's conclusion that cash-settled
19 options are "options" under the meaning of § 78c(a)(10), at least in cases where the "option"
20 gives the purchaser no pretense whatsoever to the right to obtain the underlying security.  The
21 Court agrees that the Act does not distinguish between regulated and "over-the-counter" (private,
22 unregulated) options. *See id.* at 325.  There is no language expressing or implying such a
23 distinction in the statute.  The Court also agrees that the Act does not distinguish between
24 physically-settled and cash-settled options *per se*. *See id.*  The Act does not speak in terms of
25 how the parties settle their options contracts.  But the statute at its core only lists certain

instruments, and the Court believes there is a critical distinction between: (1) cash-settled options under which the purchaser has a legal right to obtain the security but where the parties in practice agree to settle the option with cash, whether or not that intention or expectation existed when the option was given ("potentially cash-settled options"); and (2) cash-settled options under which there is no putative right to obtain the security ("necessarily cash-settled options"). The Court simply cannot agree that a contract under which the purchaser has no putative right to obtain the security is an "option." There is no good reason to read more than the common definition of "option" into the statute. An "option" is the right, but not the duty, to do something, i.e., the possibility of exercising the right to a particular course of action. Binary options simply do not contain this characteristic. They do not even give the purchaser the right to determine whether or when to execute the supposed "option." They give the purchaser no putative right to choose any future course of action whatsoever. Binary options, like necessarily cash-settled options, are wagering contracts regardless of their title.

The Court also respectfully disagrees with the Second Circuit's reasoning that the statute would not include in the definition of "security" options on groups and indexes of securities if the intent were not to regulate transactions under which it is known no physical representation of the right to the security will be delivered, because one cannot deliver a share of an index or group of securities. *See id.* at 325–26. The *Caiola* court's reasoning here is persuasive until one closely examines a critical premise upon which it is based. There have been such things as mutual funds and index funds for quite some time, for at least as long as more exotic types of "investments" like necessarily cash-settled options. Mutual funds are securities consisting of bundles of stocks and/or other securities, and index funds are a subclass of mutual funds consisting of bundles of stocks representing an entire stock index such that the value of shares of the index fund are inherently tied to the value of the index itself. The Court is aware of no reason why instruments representing shares of ownership in such funds cannot be physically delivered, whether regulated

or not. The Court agrees that in cases where the option agreement includes the right to obtain an interest in a mutual fund or index fund, i.e., potentially cash-settled options, the option is in fact an option and therefore a "security" under the statute. But if the agreement is a pure wager, with no putative right to obtain the security thereunder, as with necessarily cash-settled options and binary options, the agreement simply does not fall under the commonly understood definition of an "option," which, critically, the statute does not separately define, and it is simply a wagering contract.

The Complaint itself indicates that Defendant's website contains classic indicia of a gambling operation. For example, Defendant's website determines the amount of the payout based not upon the actual increase or decrease in the value of the underlying security but upon a predetermined payout percentage depending only on whether the price has gone up or down as of a future date and time with respect to the date and time of purchase. (*See* Compl. ¶ 16). That is, like at a racetrack or sports book, the house determines how much the wagerer wins or loses by adjusting the odds based upon the house's estimation of the outcome of the bet and/or the sums of other customers' pending bets, so as to ensure a profit for the house. In this case it is probably a computer algorithm, as opposed to a human odds maker, that makes these calculations, but the principle is the same. Also, Defendant offers "trading bonuses" to customers depositing money with Defendant in the same way that casinos entice customers to gamble by offering gambling credits, expecting that the customer will spend the free credits and then his own funds, as well. (*See id.* ¶ 22). That is the "economic reality" of these transactions. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946).

Defendants are not off the hook, however. Although they are not "options," binary options are "securities" under the statute. The statute explicitly includes in the definition of security "any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein *or based on the value thereof*) . . . ."

15 U.S.C. § 78c(a)(10) (emphasis added).  It is this parenthetical text that makes clear Congress' intent to give the SEC the power to regulate not only the trading of interests in securities, but also wagering contracts turning on the value of securities.  Although binary options are not "options" under the statute, they are "privileges . . . based on the value [of securities]" because they give the purchaser a contractual right to payment based upon the value of securities.  More specifically, they are "puts" or "calls" because they are bets that the price of the security will rise or fall.  The Court agrees with the *Caiola* court that the parenthetical phrase "including any interest therein or based on the value thereof" modifies the entire preceding phrase "any security, certificate of deposit, or group or index of securities," not only the final member of that list.  *See Caiola*, 295 F.3d at 326.  In summary, Congress has enabled the SEC under the Act to regulate wagering contracts turning upon the value of securities.  That is what binary options are, and the SEC may therefore regulate them.  The Court therefore grants the Motion for Preliminary Injunction.[2]

///
///
///
///
///
///

---

[2] The Court also notes that Defendant's operation may constitute an illegal gambling enterprise under 18 U.S.C. §§ 1955 *et seq.*  Binary options likely qualify as gambling wagers under the law of this state or any other.  Surely, then, the Government may pursue Defendants under § 1955 *et. seq.*, as well.  Binary options, because they are "securities" under the Act, necessarily do not constitute "wagers" for the purposes of the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA").  *See* 31 U.S.C. § 5362(1)(E)(i).  But the exclusion of binary options from UIGEA's definition of "wager" presumably has no effect upon whether such transactions constitute gambling under state law, and the latter analysis is the basis for a RICO action if there is a sufficient interstate nexus, which seems indisputable here.

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Preliminary Injunction (ECF No. 6) is GRANTED.

IT IS FURTHER ORDERED that Banc de Binary, and its officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those persons in active concert or participation with any of them who receive actual notice of this Order, by personal service or otherwise, and each of them, be and hereby are temporarily restrained and enjoined from, directly or indirectly, in the absence of any applicable exemption, (a) offering and selling in the United States binary options that are based on stock or stock indices and that are offered on Banc de Binary's website (www.bbinary.com), unless a registration statement is in effect as to such binary options, or (b) otherwise:

(i) making use of any means or instruments of transportation or communication in interstate commerce or of the mails in the United States to sell a security through the use or medium of any prospectus or otherwise, unless a registration statement is in effect as to such security;

(ii) carrying or causing to be carried through the mails or in interstate commerce in the United States, by any means or instruments of transportation, any security for the purpose of sale or for delivery after sale, unless a registration statement is in effect as to such security; or

(iii) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy in the United States through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the SEC as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act, 15 U.S.C. § 77h;

in violation of Section 5 of the Securities Act, 15 U.S.C. § 77e.

1    IT IS FURTHER ORDERED that Banc de Binary, and its officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those persons in active concert or participation with any of them who receive actual notice of this Order, by personal service or otherwise, and each of them, be and hereby are temporarily restrained and enjoined from, directly or indirectly, unless Banc de Binary is registered with the SEC in accordance with Section 15(b) of Exchange Act, 15 U.S.C. § 78o(b), and in the absence of any applicable exemption, acting as a broker-dealer in the United States or otherwise making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) in the United States, in violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

IT IS FURTHER ORDERED that, except as otherwise ordered by this Court, Banc de Binary, and its officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those persons in active concert or participation with any of them, who receive actual notice of this Order, by personal service or otherwise, and each of them, be and hereby are temporarily restrained and enjoined from, directly or indirectly destroying, mutilating, concealing, transferring, altering, or otherwise disposing of, in any manner, any documents, which includes all books, records, computer programs, computer files, computer printouts, contracts, emails, correspondence, memoranda, brochures, or any other documents of any kind in their possession, custody or control, however created, produced, or stored (manually, mechanically, electronically, or otherwise), pertaining in any manner to Banc de Binary or its activities.

IT IS FURTHER ORDERED that this Preliminary Injunction shall remain in effect until entry of a Final Judgment in, or other final disposition of, this action.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction over this action for the purpose of implementing and carrying out the terms of all orders and decrees which may be

entered herein and to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

IT IS SO ORDERED.

DATED this 30th day of July, 2013.

_____
ROBERT C. JONES
United States District Judge